UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: 3:11cr237(EBB) |
| | : | |
| MICHAEL MOYNIHAN | : | July 18, 2012 |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this memorandum in connection with the sentencing of defendant Michael Moynihan ("Moynihan") scheduled for July 23, 2012 at 9:00 a.m. and in response to the sentencing memorandum filed by Moynihan under seal[1] and provided to the Government on July 17, 2012 (hereafter "Moynihan Mem."). As set forth in this memorandum, the United States requests that the Court sentence Moynihan to a term of imprisonment at the bottom of the applicable Guidelines sentencing range of 10 to 16 months. A prison sentence at the low end of this range (including the split sentence option set forth in Zone C of the Guidelines Sentencing Table) is a just sentence given Moynihan's deliberate decision to obstruct a federal investigation. Such a sentence is also warranted under the sentencing factors that the Court is required to consider pursuant to 18, United States Code, Section 3553(a).

As explained below, a short prison sentence is fair and just in light of Moynihan's: (a) conduct to obstruct an official proceeding; and (b) deliberate false statements to internal Diocese investigators and FBI agents when questioned about his conduct in using off-the-book bank accounts and his decision to forge the signatures of two persons on letters submitted during the

---

[1] The United States does not believe there is any basis to seal the entire sentencing submission of defendant Moynihan. If the defense believes there is a particular portion of the sentencing memorandum, the attachments or character letters that should be sealed, the defense should request that only those portions be sealed, not the entire sentencing memorandum and supporting materials.

investigation.  Therefore, the Government requests that the Court deny defendant Moynihan's request for a non-Guidelines and a non-custodial sentence.  *See, e.g.,* Moynihan Mem. at 1, 2, 19. Quite simply, the imposition of a sentence that does not include at least some term of imprisonment for this defendant (a religious leader who endeavored to obstruct a federal investigation of his use of Church funds) would only serve to send the wrong message - - that a religious leader who knowingly lies to his Diocese employer and federal agents - - can avoid any term of imprisonment.

## Factual Background

Moynihan was employed by the Roman Catholic Diocese of Bridgeport from in or about 1993 to in or about January 2007.  He served as the pastor at St. Michael the Archangel Parish in Greenwich, Connecticut for approximately 14 years.  As pastor, Moynihan's responsibilities included ensuring that monies provided to St. Michael by parishioners be maintained for the benefit of the Parish and its parishioners, and informing the Parish Finance Council of the existence of all bank accounts used to deposit monies provided to St. Michael.

When Moynihan began serving as the pastor of St. Michael in 1993, the Parish had maintained bank accounts at Bank of America (BOA), including a Building Fund account that had been established by his predecessor and was known to the Parish Council.  In or about 2002, the Bridgeport Diocese directed each Parish to maintain only one operating bank account and to list this operating account on the general ledger of each Parish.  Despite this directive, Moynihan continued to use the BOA account without listing the account on the general ledger.  In February 2004, Moynihan opened a bank account at Greenwich Bank and Trust ("GB&T") in the name of St. Michael's Church that was also not listed on the Parish general ledger.  This GB&T account was funded largely by contributions of parishioners and was not known to the Parish Council.  In total, a little more than $2 million was deposited into the BOA and GB&T account from 2002 to 2006. Approximately $1.8 million of funds in these accounts was used to pay for Church expenses including hundreds of thousands of dollars for the Greenwich Catholic School including expenses related to an equestrian center and tennis courts on Church property.  The funds not used directly for

2

Church related expenses were the approximately $300,000 used to pay Moynihan's credit card bills and other personal expenses.

Moynihan came to the attention of the FBI during its criminal probe of Father Michael Jude Fay, a Roman Catholic pastor who was employed at St. Johns in Darien, Connecticut. During its investigation of Fay, the FBI received information that another pastor, Father Moynihan at St. Michael, was also using Church funds for personal use. The FBI requested the Diocese, through its legal representative, to provide the FBI with information regarding Moynihan's use of Church funds for personal use. In January 2007, six months after beginning its internal investigation, the Diocese requested and obtained Moynihan's resignation.

During the course of the Diocese's internal investigation and the subsequent FBI and grand jury investigation, Moynihan provided false and deceptive information. Specifically, in or about July 2006, after being advised that the FBI had requested information from the Diocese as part of a criminal investigation, Moynihan did not disclose to representatives of the Diocese the existence of the BOA Building Fund account or the GB&T account. In fact, Moynihan signed a document that indicated that there were no other bank accounts being used by him and the Church other than the single operating account at BOA. When Moynihan signed this document, he knew it was false as the document did not list either the BOA Building Fund account or the GB&T account. Moynihan acknowledged the existence of these two accounts only when confronted by the Diocese and questioned by the Diocese about why he used funds in those accounts for personal use.

During the internal investigation, Diocese investigators sought to determine why Moynihan used funds in an off-the-books account to pay for personal, as opposed to Church, expenses. In short, Moynihan provided false and misleading information to accountants retained by the Diocese. Specifically, in an effort to justify certain expenditures from these undisclosed accounts, Moynihan provided accountants with a number of substantiating letters. Two of these letters were purportedly signed by persons that indicated that they each had received funds from Moynihan. These letters were submitted by Moynihan in an effort to somehow demonstrate that funds from the undisclosed

3

accounts were used for Parish-related purposes and/or that Moynihan had used his own funds for a Parish related expense that made him eligible to be reimbursed by Church funds to pay his credit card bills or personal expenses. When Moynihan submitted these substantiating letters to the Diocese's accountants he signed two of the letters without authority and in the process forged the signatures of a judge and a parishioner. The letters falsely indicated that an organization that the judge was involved with had received $11,000 and that the parishioner had received numerous payments from Moynihan.

In late 2010, knowing that a federal grand jury was investigating whether he used Parish funds for his personal benefit, Moynihan met with agents of the FBI pursuant to a proffer agreement to provide information regarding, among other things, how the funds in the undisclosed accounts were expended. During the course of a proffer interview in late 2010, Moynihan provided false information to the agents by indicating that he had not forged the parishioner's signature on the substantiating letter although he knew then that he had signed this parishioner's name without authority to do so.

Although Moynihan later acknowledged in the proffer that he lied to the federal agents about the signature on the letter, he continued to maintain that he only used Church funds to reimburse himself for funds he had advanced on behalf of the Church. When Moynihan was pressed at the proffer meeting to explain where he had obtained the money to use to lay out funds on behalf of the Church given his small salary, Moynihan suggested that: (a) donors had given Moynihan cash for his personal use; and that (b) that there were times he needed to pay a Church expense in cash to receive a discount.

Moynihan's explanations for his accounting practices were nonsensical and illogical. The records indicated that Moynihan did use approximately $1.8 million of the funds in the two off-the-book accounts for Church related expenses so the Government is not suggesting that the creation of the off-the-book accounts was an effort to steal millions of dollars from parishioners. *Cf. United States v. Michael Jude Fay*, 3:07cr198(JBA) (pastor convicted of stealing more than $1 million of

4

Church funds from off-the-book accounts). Nevertheless, the records indicated that Moynihan did use approximately $300,000 of the funds in these off-the-book accounts to pay personal expenses including his credit card bills. The suggestion that Moynihan was entitled to use all of these funds to reimburse himself strains credibility given the fact that he kept no records to account for how much he supposedly advanced from his own funds. In short, it defies common sense to think that Moynihan used $300,000 of his own funds to pay Church bills in cash (as there was no indication in the records reviewed that he paid the bills by check) and then used $300,000 from off-the-book accounts to repay himself for laying out his own funds. Quite simply, if Moynihan needed to pay Church bills in cash to receive a discount, or did not want the Diocese to second guess his decisions to lay out Church funds on certain Church expenditures, he had two off-the-book accounts that he could use to obtain the necessary funds and pay bills without being second guessed by the Diocese.

What is clear, and what Moynihan has now admitted, is that he:

1. Signed and submitted a letter to the Diocese during an internal investigation conducted in response to an FBI request knowing it was false as it did not disclose the existence of two off-the-books accounts that he was aware of;

2. Forged the signature of a judge and a parishioner in the substantiating letters that were submitted to Diocese investigators during the internal investigation; and

3. Lied to the FBI agents during a proffer when he initially suggested that he had not forged the parishioner's signature.

Moynihan engaged in these obstructive acts after being told that there was a criminal investigation being conducted by the FBI and that the Diocese was seeking to gather information in connection with that criminal probe. When Moynihan signed and created false documentation and thereafter lied to the FBI, he was seeking to obstruct a criminal investigation that sought to discover whether he had improperly used Church funds for personal use.

Moynihan has no criminal history and has spent the vast majority of his adult life working as a pastor. As a result of his criminal conduct and conviction, it is unlikely that he will be able to

serve as a pastor in any church. While the FBI agents have spoken to numerous witnesses connected with the Parish, there is no information to suggest that Moynihan was an absentee pastor or failed to work tirelessly on behalf of the Parish. In fact, information gathered during the investigation suggests that during his tenure at St. Michael, Moynihan served the parishioners as he was expected to do and was well liked by the parishioners.

### A. The PSR Has Correctly Determined that the Applicable Guidelines Range is 10 to 16 Months.

On December 8, 2011, Moynihan entered a plea of guilty to a one-count Information charging him with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c). The Information charged that Moynihan concealed his use of the off-the-book accounts and thereafter provided false and misleading information in a corrupt effort to influence and impede a federal grand jury proceeding. On his conviction for endeavoring to obstruct an official proceeding, Moynihan faces a statutory maximum prison sentence of twenty years. The Probation Office has conducted a thorough presentence investigation and compiled a detailed Presentence Report ("PSR"). The PSR concludes that Moynihan faces an advisory Guidelines sentencing range of 10 to 16 months and a criminal fine range of $3,000 to $30,000. *See* PSR ¶¶ 55, 61.

Although the Sentencing Guidelines are no longer mandatory, the Guidelines must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Crosby*, 397 F.3d 103, 110 (2d Cir. 2005); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007) ("district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process"); *see also id.* at 46 ("though the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions") (footnote omitted); 18 U.S.C. § 3553(a)(4) (Court shall consider the sentence applicable under the Guidelines). The Court should impose a Guidelines sentence in this case.

    **B.**    **The Section 3553 Factors Should Guide the Court's Sentencing Decision to Impose A Prison Sentence in this Case**.

Title 18, United States Code, Section 3553(a) provides, in pertinent part, that:

> (a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider–
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed–
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
>     \*\*\*
> (4) the kind of sentence and sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines
>     \*\*\*
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

    **1.**    **The Nature and Circumstances of the Offense.**

Moynihan's decision over a number of years to provide false and misleading information and documentation to internal Diocese investigators and FBI agents is a serious offense. That Moynihan was a religious leader makes the crime even more serious. In this case, Moynihan sought to mislead investigators and distort the facts to prevent the full truth about his own conduct from becoming known. Given that the investigation by both the Diocese and federal authorities was seeking to determine whether parishioners in Moynihan's own Parish had been defrauded, it is disturbing that Moynihan would interfere with such efforts. In short, rather than seeking to protect those who trusted him to lead, Moynihan thought only of his own desire to keep his conduct hidden. When Moynihan sought to mislead Diocese and federal authorities, he engaged in the type of obstructive conduct that must be sanctioned by the imposition of criminal penalties. Any sentence that does not

7

include a prison term would suggest that the crime Moynihan committed is not serious. Nothing could be further from the truth. As the Court is well aware, obstruction of justice is a very serious offense that must be deterred by the imposition of a prison sentence.

The Government rejects Moynihan's suggestion that a prison sentence in this case would be unnecessary because Moynihan has already suffered in other ways such as losing his ability to be a pastor. Moynihan Mem. at 16. When you strip Moynihan's crime down to its base, Moynihan sought to conceal the truth about what he had been doing with off-the-book accounts under his control that involved millions of dollars of contributions from parishioners. This type of criminal behavior from a religious leader deserves a prison sentence. The fact that Moynihan will no longer be able to serve as a pastor is not a criminal penalty. Rather, it is a decision by religious institutions not to employ someone as a pastor who spent numerous years hiding financial information from his superiors and then, after being confronted, provided false and misleading information during a federal criminal probe.

2. **History and Characteristics of Moynihan.**

Although Moynihan does not have a prior conviction, there are many important facts about his history and characteristics that merit consideration. First, the duration of his criminal conduct - - providing false information during 2006, 2007 and then again in 2010 when questioned by FBI agents - - shows that Moynihan's criminal conduct was not an isolated mistake. Moynihan, at the very least, knowingly engaged in obstructive conduct over a period of years. When he realized that the hidden off-the-books accounts had been discovered, his instinct was to keep the obstructive efforts going and conceal his own conduct by forging the signatures of other persons on substantiating letters. Second, Moynihan's criminal conduct was not born out of any deprived upbringing or lack of formal education and opportunity. His formidable educational background and religious training surely gave him a moral compass to recognize that lying to conceal the truth about his own conduct was seriously wrong. There is simply no excuse for a religious leader to knowingly lie and provide false documentation when an effort is being made to uncover facts

surrounding off-the-book accounts.    Given all these characteristics of Moynihan, a short prison sentence at the bottom of the Guidelines is clearly warranted.

### 3.  The Sentence Must Promote Respect for the Law

The sentence in this case must reflect the seriousness of the offense committed by Moynihan and provide a message of deterrence to all leaders of institutions (religious leaders, corporate executives, white collar professionals) who are thinking of obstructing a federal criminal investigation. When these types of leaders cannot be trusted to tell the truth, the confidence and respect that is accorded to these institutions suffers greatly.  A prison sentence should be imposed in these types of cases to demonstrate that those leaders who obstruct a federal proceeding  are punished with something more than a sentence of Probation - - which amounts to a proverbial slap on the wrist and an order not to do it again.   Thus, it is a rather axiomatic that the sentence in this case must be significant enough to reflect the fact that Moynihan's criminal conduct is a serious offense.   In short, a sentence that does not include any term of imprisonment for Moynihan's conduct will not promote respect for the law.

### 4.        The Court Should Consider General Deterrence.

One of the factors the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The Government requests that the sentence imposed on defendant Moynihan satisfy the goal of general deterrence in this case. The message must be sent to all leaders that interact with internal investigators and federal agents like the FBI that there are serious consequences to obstructing a federal proceeding and lying to federal investigators. A prison sentence at the bottom of the Guideline range will send an appropriate and understandable message.  A non-custodial sentence, or a sentence of Probation, would not send the appropriate message of general deterrence.

There is no doubt that Moynihan's conviction will have an impact on his career as a religious leader and will likely prevent him from serving in a similar position in the future.  But neither of these consequences alone or in combination is enough to warrant a non-custodial sentence.  A

message of general deterrence must be clear that not only are there professional consequences from engaging in criminal activity, but there is a jail sentence as well. When other similarly situated leaders see one of their own go to jail, and not just punished by loss of a professional opportunities, these other leaders will understand the message. The Court should reject the notion that religious leaders or other types of white collar professionals should be sentenced more lightly than the powerless because, for the former, the embarrassment of conviction alone is more devastating than it would be for those who have enjoyed fewer advantages in life.

       **5.**      **The Court Should Consider Other Sentences Imposed for Obstructive Conduct.**

One of the 3553(a) factors for the Court to consider is the need to avoid unwarranted sentencing disparities. Other recent cases in this district for similar crimes involving obstructive behavior have resulted in prison sentences. *See United States v. Elliot Wilson*, 3:10cr7(CSH) (building official sentenced to five months in jail and five months of house arrest for providing false testimony to grand jury investigating corruption where Guidelines range was 10-16 months); *United States v. Robert Scinto*, 3:10cr207(CSH) (developer sentenced to six months in jail and six months of house arrest for lying to FBI agents during corruption investigation where Guidelines range was 0 to 6 months); *United States v. Juan Carlos Guillen Zerpa*, 3:11cr76 (SRU) (accountant sentenced to 14 months in jail for conspiring to create fraudulent document and lying to SEC officials during official SEC investigation where Guidelines range was 27 to 33 months); *United States v. Juan Carlos Horna Napolitano*, 3:11cr86(SRU) (businessman sentenced to 14 months in jail for conspiring to create fraudulent document during official SEC investigation where Guidelines range was 21 to 27 months).

 **C.**      **The Court Should Enter an Order of Restitution**.

The Diocese has requested that the Court impose an order of restitution pursuant to the restitution statutes, 18 U.S.C. § 3663 et. seq., naming St. Michael and/or the Diocese as a victim of Moynihan's criminal conduct. In order to impose restitution under the restitution statutes, the Court will need to first determine whether St. Michael and/or the Diocese is a "victim" within the meaning

of the restitution statutes.  Sections 3663(2) and 3663(A)(2) define a "victim" as "a person directly and proximately harmed as result of the commission of the offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern."  Given that the Diocese was victimized by having to spend far more time and money to conduct an internal investigation as part of the federal criminal probe that Moynihan sought to obstruct by providing false information to the internal investigators, the Court has the ability to enter an order of restitution here.  *See* Letter Dated May 18, 2012 enclosing Victim Impact Statement of St Michael Roman Catholic Church Corporation and the Roman Catholic Diocese of Bridgeport with supporting documentation detailing expenses of $409,430 incurred as a result of defendant's false statements to internal investigators and obstruction of an official proceeding.

      Case law supports the Diocese's request.  *See, e.g., United States v. Skowron*, 839 F.Supp. 2d 740 (SDNY 2012) (where defendant pled guilty to conspiring to commit securities fraud and obstruct justice, employer of defendant entitled to restitution as defendant's cover up was critical component of offense and it caused employer to incur additional costs during internal investigation); *United States v. Haggard*, 41 F.3d 1320 (9th Cir. 1994)(defendant convicted of lying to FBI and lying to grand jury regarding whereabouts of child who had been kidnaped ordered to pay restitution to child's mother who went on disability when it was determined that defendant had lied about child's whereabouts during federal kidnaping probe); *United States v. Amato*, 540 F.3d 153, 159-163 (2d Cir. 2008) (upholding restitution to corporate victim for expenses incurred during corporation's participation in the investigation and prosecution of the offense, including attorney's fees and accounting costs); *United States v. Battista*, 575 F.3d 226, 231 (2d Cir. 2009) (noting definition of "victim" includes persons directly and proximately harmed as a result of commission of offenses and upholding restitution order to NBA for expenses incurred during criminal investigation where defendant was convicted of interstate gambling charge).

## CONCLUSION

For the foregoing reasons, the Government submits that the Court should sentence defendant Moynihan to a term of imprisonment at the bottom of the applicable Guidelines range and enter an order of restitution as part of the judgment.

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

`/S/`
RICHARD J. SCHECHTER
SENIOR LITIGATION COUNSEL
Federal Bar No. CT24238
United States Attorney's Office
1000 Lafayette Boulevard
Bridgeport, Connecticut 06604
(203)696-3000

<u>CERTIFICATION OF SERVICE</u>

      I hereby certify that on July 18, 2012, a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                        ____/s/_____
                                        Richard J. Schechter