## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff** | **: CASE NO.: 3:11CR237 (EBB)**<br>:<br>: |
| **V.** | :<br>: |
| **MICHAEL MOYNIHAN,**<br>**Defendant** | :<br>: **June 26, 2012** |

### DEFENDANT MICHAEL MOYNIHAN'S
### MEMORANDUM IN AID OF SENTENCING

On December 8, 2011 the defendant, MICHAEL MOYNIHAN, pleaded guilty to Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c). The defendant's plea agreement and USPO Robert Bouffard's calculations reflect that the defendant's total offense level is 12, with an advisory guidelines of 10-16 months' incarceration.[1] The defendant respectfully submits that a non-guidelines sentence involving either probation or home confinement is sufficient to achieve the goals of sentencing and consistent with 18 U.S.C. § 3553(a).

---

[1] The defendant's fine range is between $3,000 and $30,000.

## 18 USC § 3553(a) SENTENCING FACTORS

The defendant's guidelines range plays an important part in determining an appropriate sentence.  However, as the Court is well aware, <u>Booker</u> and it progeny have re-established the Court's role of evaluating each individual and his or her unique circumstances and the nature of the offense.  While the Court must consider the defendant's guidelines range, after "considering all other relevant factors, the Court should proceed to determine an appropriate sentence, which may or may not be within the guidelines-recommended range."  <u>United States v. Thomas</u>, 628 F.3d 64, 67 (2d Cir. 2010).  The defendant respectfully submits that a sentence of probation or home confinement with community service as a condition is an appropriate sentence and is sufficient but not greater than necessary to meet the goals of sentencing.  18 U.S.C. § 3553(a).

### The Nature and Circumstances of the Offense

In 2006, St. Michael's Church in Greenwich, Connecticut, and ultimately Father Michael Moynihan as the Parish's steward, became the focus of a federal inquiry into the Church's financial practices.  In July, 2006, representatives of the Bridgeport Diocese sent a letter to the defendant, Father Moynihan, inquiring whether he maintained any off the books accounts, acting in his capacity as St. Michael's Pastor, of which the Diocese

was unaware.[2] At the time of the query, Father Moynihan maintained an on the books account with Bank of America, and two off the books accounts in the name of St. Michael's of which the Diocese was unaware. The first of the off the books accounts was a Bank of America Building Fund Account (the "BOA BFA"), that had been opened by the defendant's predecessor, Monsignor Thomas Guinan. Father Moynihan used this account throughout his term at St. Michael's, and he continued to use this account after the Diocese, in 2002, ordered that every Parish maintain only one bank account that was to be listed on the Parish's general ledger. In addition, the defendant had opened an additional off the books account in 2004 at Greenwich Bank and Trust (the "GB&T account"). Father Moynihan opened this account in conjunction with plans to expand Greenwich Catholic School, a grammar school that provided education for grades K-8, into an International Baccalaureate Organization School, to implement an Equestrian program for the School, and to repair and improve the Church and Rectory. As indicated in the defendant's PSR, the money that was deposited into the GB&T account came from donations made by St. Michael's parishioners, as well as non-parishioners who supported the School and the Equestrian program.

---

[2] It is undersigned counsel's understanding that a similar letter was sent to the other 86 Parishes in the Diocese. Representatives of the Diocese sent those letters following an investigation into St. John's of Darien, Connecticut, and subsequent prosecution of Father Michael Fay in 2006 for committing fraud, in violation of 18 U.S.C. § 2314.

In response to the Diocese's July, 2006 inquiry, Father Moynihan closed the GB&T account in August, 2006, and thereafter signed a form provided to him by the Diocese confirming that he did not maintain any accounts other than the on the books Bank of America account.  As the Diocese's investigation continued, Bishop William Lori established a team of Diocese employees and hired an accounting firm, Grant Thornton, to reconcile the accounts.  Members of the Diocese and representatives from Grant Thornton repeatedly questioned Father Moynihan about certain expenses related to these accounts, credit card expenditures and cash payments.   Grant Thornton representatives required the defendant to provide written explanations and confirmations for hundreds of donations and thousands of expenditures.  Grant Thornton set strict deadlines within which Father Moynihan had to meet these demands.

Throughout the course of Grant Thornton's review, which continued for over a year and a half, Father Moynihan, with the assistance of members of the Parish Finance Counsel[3] and legal counsel at Patterson Belknap Webb & Tyler, LLP, responded to these inquiries.  Letters were sent to over a hundred vendors, employees and other individuals requesting verification that work was in fact performed and expenditures were made on behalf of St. Michael's Church and Greenwich Catholic School.   The defendant

---

[3] While the Parish Finance Council knew about the existence of the BOA BFA account, it was unaware of existence of the GB&T account, and only became aware of its existence in July, 2006 when the defendant was told by the Diocese that he had to close that account.

submitted multiple responses and provided detailed information regarding the thousands of checks that flowed through the accounts, and supplied thorough explanations of charges on his personal credit cards and for various vendor invoices.

During the course of the audit, employees of both the Diocese and Grant Thornton questioned everyone who had ever worked with Father Moynihan regarding their knowledge of his disbursements in an effort to verify whether services were in fact provided. Grant Thornton rejected, without explanation, many of Father Moynihan's explanations of his expenditures. Moreover, neither the accounting firm nor any member of the Diocese would identify which items were being denied as unsubstantiated, despite repeated inquiries by both the defendant and the individuals assisting him in his submissions.[4] Grant Thornton worked with another accounting firm, BDO Seidman, to review a portion of Grant Thornton's findings. Neither accounting firm would make their reports available for the defendant or his attorneys to review, unless Father Moynihan would agree not to contest the findings. Further, the reports from both accounting firms were only made available to parishioners who called to make an appointment to read such findings.

---

[4] The defendant remained Pastor while complying with Grant Thornton's continuing requests for expenditure verifications, without any interface regarding his responses. In or about October 2006, the Diocese took away Father Moynihan's check signing authority at St. Michael's.

It was in this antagonistic and confrontational environment that the defendant forged two of the confirmation forms and lied to the accountants, the Diocese, and ultimately the government.  Among the confirmation letters that Father Moynihan was required to provide to Grant Thornton were corroborations of expenditures related to the Columbus Foundation, a New York City-based philanthropic and cultural organization, and to ███████████ a parishioner. In response to the Diocese's demand for accounting for these funds, the defendant forged the signatures of ███████████ from the Columbus Foundation,[5] and of ███████████

In December, 2006, Bishop Lori met with Father Moynihan and notified him that he learned of the existence of the BOA BFA, and that Father Moynihan would have to close the account immediately.  Bishop Lori pressured the defendant to resign, telling him that he had been given several opportunities to disclose the existence of this account and that the Bishop would begin the removal process if he did not step down.  Following several meetings that took place among Father Moynihan, Bishop Lori and others, the defendant submitted a letter of resignation to St. Michael's parishioners and left his position at St. Michael's in January, 2007, while remaining a priest in good standing (see attached).

---

[5] This confirmation was provided by Father Moynihan to Grant Thornton, and the defendant was confronted about and acknowledged the forgery before the accounting firms submitted their report.

Approximately two years after the defendant's resignation, Father Moynihan was contacted by FBI Agent Jason Breen, who informed the defendant that federal agents wanted to question him about expenditures related to St. Michael's Church and Greenwich Catholic School. The defendant retained Attorney Wayne Keeney to assist him in providing federal agents with documentation containing the multiple substantiating confirmations that he had previously sent to Grant Thornton and the Diocese related to his expenditures.[6] In 2010, the defendant retained undersigned counsel and Attorney Mark Sherman to continue to assist him in his efforts to supply documentation related to his expenditures.[7] The defendant provided documentation to the extent that he was able to do so, and produced for the agents a list of donations that he received from parishioners with as much detail as he was able to recall regarding the amount and date of each donation.

In 2010, the defendant met with law enforcement and Senior Litigation Counsel Richard Schechter to answer questions regarding these donations and disbursements. When questioned by the government about a signature on a confirmation letter purportedly signed by parishioner ███████████, Father Moynihan initially denied the fact that he had forged ███████████ signature. The agents were aware of the forgery

---

[6] Undersigned counsel is uncertain whether these documents had ever been previously provided to the government by either the Diocese or the accounting firms that they hired.
[7] Attorney Keeney was unable to continue to represent the defendant due to a medical issue.

and confronted Father Moynihan about his misrepresentation.  At this meeting, Father Moynihan admitted his falsification, and later explained that he was scared to admit that he forged someone else's signature while under a tremendous amount of stress.

The defendant believed when he signed the documents that the information contained therein was correct.[8]  This in no way mitigates the fact that he forged two signatures, and lied about one of them when questioned in a proffer session by federal agents.  The defendant perceived the Diocese's investigation as the culmination of years of tension and antagonism between himself and the Bishop over his personal relationship with another man.  After being accused of swindling money from a Parish that he loved, and after being removed and ultimately excommunicated, the defendant was bitter and disappointed in himself.  The defendant is sorry he did not fully grasp the fact that law enforcement agents wasted time and resources that could have been devoted to other investigations as a result of his deception.  The defendant regrets his transgression and has been humiliated by the publicity surrounding the Diocese's investigation, humbled by his subsequent prosecution and devastated by the consequential loss of his life's calling.

**The History and Characteristics of the Defendant**

---

[8] The defendant maintains that he gave money to ██████████ in the amount he represented on the confirmation forms.  ██████████ was a parishioner who was in financial distress and needed money to pay bills.  When Father Moynihan asked ██████████ to sign confirmation related to these payments, ██ refused to sign the documents.  The Church continued to provide financial support to ██ ██████████ after Father Moynihan resigned, by way of checks signed by the Bishop.

The defendant was ordained a priest in 1979 in Vatican City in Rome, Italy, and committed himself fully to the priesthood for almost three decades. The defendant's first assignment was at Sacred Heart Church in Stamford, Connecticut. Father Moynihan worked there for three years, where he ran the Youth program and was in charge of religious education. The defendant then worked at St. Mary Parish in Stamford, Connecticut. From there, the defendant worked at St. Raphael Church in Bridgeport, Connecticut as one of the associate priests,[9] where he remained until he went to Rome for doctoral studies in Canon Law. While in Rome, the defendant continued to exercise ministry as a Navy Chaplain; upon the conclusion of his studies, he returned to Connecticut and was sent first to Brookfield, Connecticut and then to St. John's Church in Stamford, Connecticut. Significantly, Father Moynihan never received any training regarding or information related to Parish finances or operational financial procedure during the course of his employment at any of these Parishes.

After serving at St. John's for over two years, Father Moynihan met with Bishop Edward Egan, who informed him that Father Moynihan was going to be assigned to St. Michael's Church in Greenwich, Connecticut, where he would serve as their new Pastor. In addition to St. Michael's Church, the Parish also included St. Timothy's Chapel-

---

[9] Father Moynihan was sent to both Sacred Heart and St. Rafael because he is fluent in Italian and both Parishes had a large Italian-speaking population.

Banksville, a small Church in Greenwich that preceded St. Michael's.   Bishop Egan made it clear to Father Moynihan that this Parish was financially critical to the Diocese, and that Father Moynihan was expected to generate large revenue from contributions and to revitalize the Greenwich Catholic School that was affiliated with St. Michael's.[10]

In 1993, when Father Moynihan began as Pastor at St. Michael's, he replaced Monsignor Thomas Guinan, who had served as the Pastor at St. Michael's for over twenty-five years.  Approximately one week before Father Moynihan was to begin his period of service, he met with Monsignor Guinan to gain some insight into the business end of running the Church.  This meeting lasted approximately three hours.  During that meeting, Monsignor Guinan acquainted Father Moynihan with the Parish, showed him around the Rectory and introduced Father Moynihan to the two associate priests, Fathers Kennedy and Connolly.  Monsignor Guinan told the defendant that the parishioners at St. Michael's were very generous, and reiterated the Bishop's directive that the Diocese had high expectations related to revenue.

Monsignor Guinan informed the defendant of St. Michael's fiscal status, and indicated that the finances were up to date and that all outstanding bills had been paid.

---

[10] St. Michael's Parish consists of 25 acres allotted to Greenwich Catholic School and five acres allotted to St. Michael's.  In addition, the property includes a substantial residence which was used as a convent, the Rectory building, and the guest house used by priests serving the Parish.  In addition, St. Timothy's Chapel, in Banksville, is part of St. Michael's Parish.

Monsignor Guinan explained to Father Moynihan that he maintained an off the books Building Fund account of which the Diocese was unaware, and advised the defendant against disclosing this account. Monsignor Guinan told the defendant that the account was maintained to ensure that parishioners' donations remained within the Parish, not the Diocese, as at that time the Diocese was regularly entering into monetary settlements related to ongoing sexual abuse litigation. Monsignor Guinan also advised that some funds should be set aside in case of emergencies or unexpected need, as many of the parishioners went away for the winter months, which would result in a loss of steady revenue.

As explained in the preceding paragraphs, Father Moynihan had no training regarding accounting or financial management prior to his tenure at St. Michael's. Immediately upon beginning his term as Pastor, the defendant worked with ███████████ ███████████ who had worked at St. Michael's for over ten years prior to the defendant's arrival, to manage Church and School finances. The defendant also sought advice from other Priests.

The defendant spent almost fifteen years making St. Michael's a welcoming place for young families and creating a sense of community, turning the Church into so much more than just a Sunday morning place of worship. From the first day of his tenure, the

defendant had to tackle the upkeep of the buildings.[11]  The defendant was responsible for these repairs, and he learned that many of the service providers for St. Michael's, St. Timothy's and Greenwich Catholic School were paid in cash at a discounted rate and/or with checks from the off the books account.[12]  Moreover, as the Church did not have any credit cards in its name, Father Moynihan routinely charged purchases for the Church and School on his credit card account.

The defendant worked hard to meet the parishioners' high expectations for the School, the Church, and its grounds.  The defendant sat on the Board of Directors of Greenwich Catholic School and served on the Board of Education as the on-site Pastor. The defendant interacted regularly with parents, faculty and students.  Approximately one year into his tenure at St. Michael's, the defendant was elected President of Greenwich Catholic School, and was responsible for the overall financial and spiritual condition of the School.  While managing the daily affairs of the School, the defendant was a central part of its fundraising efforts and budget.

Father Moynihan was ever-present at St. Michael's.  The defendant attended Parish meetings and conducted religious services; he provided, on a constant basis, his

---

[11] The grounds, Rectory, Church and the School were in various states of disrepair.  By way of example, soon after the defendant's arrival, the bathroom in the Rectory needed to be fixed, the air conditioning system broke down and the windows in the School had to be replaced.
[12] It is undersigned counsel's understanding that this was common practice in the Parishes.

services to any student and/or parishioner who needed them, including hospital and home visits, last rites and extensive counseling. While fulfilling all of these roles, the defendant also served as Chaplain of the Banksville Fire Department, the Knights of Columbus, SUNY Maritime College, the Diocesan Director of the Council of Catholic women, and Legatus, the Catholic CEO organization of Fairfield County. The defendant was also responsible for the Diocesan Red Mass for the legal community and served for two terms—six years—as Territorial Vicar.

Not surprisingly, membership doubled in size, from eight hundred to sixteen hundred families during the defendant's tenure at St. Michael's. The defendant initially addressed the growing Parish by increasing the number of services, but he realized that he needed to expand the Church building itself in order to accommodate the increased membership. As membership in the Church grew, Father Moynihan put money aside for many of the projects that he felt were necessary to improve the Church.

When the defendant arrived at St. Michael's, Greenwich Catholic School was perceived as substandard to local Private schools. The defendant realized that he needed to raise substantial amounts of money for the School, beyond what had been budgeted for, to renovate and repair the buildings, retain teachers and update the curriculum. The defendant added Latin to the curriculum, and taught Latin and religious studies at the

13

School in addition to serving as its President.  The defendant also began a program called Italian for Toddlers.  Additionally, the tennis courts were in poor condition and the defendant knew that he needed to invest a significant amount of money for these repairs. The defendant also raised and earmarked money to start an Equestrian program at the School (see attached).  The School became competitive with and a viable alternative to the nearby Private schools and developed a significant waiting list.

While meeting St. Michael's parishioners' expectations for both the Church and Greenwich Catholic School, Father Moynihan fulfilled his fundraising obligations to the Diocese.  The Diocese set goals for the Parish that Father Moynihan exceeded regularly, even as the goals increased annually.[13]  The defendant held benefits, receptions, and made personal entreaties to produce revenue above and beyond what the Diocese expected.  As part of the defendant's fundraising responsibilities to the Diocese and his Parish, the defendant was expected to take parishioners and other possible donors out to dinners, host them at the Rectory, hold cocktail receptions and dinners, and organize many other events.  The defendant ensured that these fundraisers were successful. Father Moynihan was given free rein to do whatever was necessary to encourage potential donors to contribute.  Members of the Diocese were aware that the defendant

---

[13] St. Michael's Parish was responsible for raising a significant portion of funds, as it was one of the five wealthiest parishes in the Diocese.

spent large sums of money on occasion to buy gifts for visiting clergy, to take people out to dinners and for various other events (see attached).

The Parish continued to grow, the School thrived, and St. Michael's always exceeded the Diocese's fundraising goals. The defendant used money to make money, was ever-present at the Church and School and put all of his effort into ensuring the continued vitality of his Parish. To this end, the defendant used accounts of which the Diocese was unaware.[14] As stated earlier, although this policy of using off the books accounts was in accordance with prior practice, the Diocese issued a mandate in 2002 to end this tradition. The defendant ignored this directive. When the Diocese ordered that Parish leaders were only to use on the books accounts, this was nothing new. Many Parishes had off the books accounts, and a written policy mandating the end of the practice did not stop a custom that was implemented to keep the Diocese in the dark about the existence of the money to begin with.

The defendant's refusal to close one of these accounts after being directed to do so invited suspicion into his financial stewardship. The defendant's commingling of funds throughout his term at St. Michael's compounded the defendant's difficulties providing accurate accounting for Church and School related expenditures. Notably, it is

---

[14] Even now, in 2012, changes are being implemented to update Parish financial practice to address the longstanding issues of mismanagement of funds and ensure accountability for spending. The Diocese has recently established internal guidelines and controls to ensure consistent and responsible bookkeeping.

obvious from the many letters submitted on the defendant's behalf by parishioners that the defendant was completely committed to St. Michael's, and all of the improvements and changes were known to and approved by the Diocese as well as the parishioners and other donors. Also notable from some of the submissions is the fact that parishioners gave money with the express instruction that these funds be used toward the Church and not the Diocese, where they felt they would have no say in how the money would be used.

**The Need for the Punishment to Reflect the Seriousness of the Offense**

Any attempt to obstruct a federal investigation must have consequences. Regardless of why the defendant made misrepresentations to the Diocese, those reasons can never justify obstructing a Federal investigation. The defendant made extremely poor choices during the course of his employment and throughout this investigation. However, the defendant has been punished in ways that are inapplicable to other defendants who have faced punishment for this offense. The defendant's conduct initially resulted in a series of restrictions and demotions related to canon law; when he turned to the Episcopal Church for support, he was excommunicated by the Roman Catholic Church. Father Moynihan lost a highly coveted and hard-earned position of employment, and most likely will never again lead a Parish as a result of his conduct.

The defendant, who had never before been involved with the criminal justice system, now has a federal felony conviction that will continue to drastically impact his life.[15]

A sentence of probation would serve as a general deterrent in this case. A sentence involving any restriction on the defendant's freedom for a period of time would adequately reflect the seriousness of the offense and send a strong message to the community that this conduct will be punished severely. The defendant has no criminal history and has led an exemplary life for almost six decades. But for this transgression, he has an unblemished record. The defendant respectfully submits that probation or any period of home confinement is an appropriate sanction for general deterrence purposes. Undersigned counsel respectfully suggests it would be in the interests of justice to require the defendant to perform community service on a regular basis. The defendant has always served the community and would continue to do so while serving his sentence.

**The Need to Provide Specific Deterrence and to Protect the Public from Further Crimes of the Defendant.**

As noted in the PSR, the defendant is not at risk to reoffend. The defendant is an individual who had far to fall. The defendant lost a position where he was held in high

---

[15] The defendant is currently a member of the Episcopal Church. In 2009, the defendant approached the Episcopal Bishop of Long Island to determine if he would be able to function as a priest in the Episcopal Church. At the time, Father Moynihan understood that he would be able to serve in that capacity; however, when he pleaded guilty in New Haven District Court to a felony Information, the Bishop informed him that a felony conviction would bar him from proceeding as a priest in the Episcopal Church.

esteem, ████████████████████████████████████████████████████████

investigation and ultimately excommunicated by the Roman Catholic Church. The defendant's life has been on hold for the past several years. It is unlikely that he will ever be able to administer a congregation. Especially over the past year, the defendant has felt the sting of the Church's sanctions and this criminal prosecution and the domino effect his deception and criminal conduct has had on his professional, spiritual and personal life. These penalties, somewhat idiosyncratic to the defendant, have impressed upon him that he is not above either the rules of an employer or federal law.

The fact that the defendant's conduct represents his first criminal offense at a more mature stage in his life is something the Court can consider when evaluating specific deterrence and determining an appropriate sentence. Although the defendant is only fifty-nine years old, that he has led a law-abiding life up until committing this offense is a good indication that he will continue to do so following the resolution of this matter. The unlikelihood of recidivism for someone in the defendant's age range with no criminal history has been recognized by the Sentencing Commission: "offenders in Criminal History Category I have a substantially lower risk of recidivating within two years than do offenders in Criminal History Category VI." The commission has also recognized that recidivism rates decrease with age. See Report of United States

Sentencing Commissioner, "Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines" May, 2004.  The defendant has refrained from criminal activity for over five decades, during the six year investigation into his conduct and throughout the six month period he has been on pretrial release.  This, combined with other factors, warrants consideration.  Undersigned counsel submits that having a felony conviction and serving a period of probation or any period of home confinement will serve as a specific deterrent and have a profound effect on this defendant.

## The Need to Provide the Defendant with Educational or Vocational Training or Medical Treatment

As reflected in the defendant's Presentence Report, the defendant has spent his entire life training to be a priest.  The defendant is committed to continuing his education in this regard.  The defendant knows that his shortcomings in relation to this investigation and the after-effects of his criminal conduct mean that he will have to find other ways to use his education.  Any vocational training, if deemed necessary or constructive by Probation, would best be achieved while on Supervised Release.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests a non-guidelines sentence of probation, or in the alternative, a sentence involving a period of home confinement.

RESPECTFULLY SUBMITTED,

THE DEFENDANT,
MICHAEL MOYNIHAN

BY___/s/ Audrey Felsen_____
    Audrey A. Felsen, Esq.
    Koffsky and Felsen, LLC
    1150 Bedford Street
    Stamford, CT  06905
    Tel.: 203-327-1500
    Fax: 203-327-7660
    Federal Bar No.: ct20891
    Jmarsh5900@aol.com

## **CERTIFICATION**

THIS IS TO CERTIFY that on July 17, 2012, a copy of the foregoing was hand-delivered and/or emailed to anyone unable to accept electronic filing.

_____/s/ Audrey Felsen_____
Audrey A. Felsen